**Michael J. VON BRIMER et al., Co-executors of the Estate of Joseph W. Von Brimer, Deceased, Plaintiffs,**

**v.**

**WHIRLPOOL CORPORATION, Defendants.**

**No. C–51323.**

United States District Court, N. D. California.

Aug. 20, 1973.

Belli, Ashe, Ellison & Choulos, San Francisco, Cal., for plaintiffs.

Carl Hoppe, Charles E. Hanger, San Francisco, Cal., Burton Y. Weitzenfeld, Chicago, Ill., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PARTIAL JUDGMENT

RENFREW, District Judge.

On May 13, 1969, plaintiff Joe W. Von Brimer * filed a three-count complaint against Whirlpool Corporation ("Whirlpool") arising out of defendant's conduct in connection with the issuance of United States Letters Patent Number 3,194,032, for an "Improvement in Automatic Washing Machines," or more specifically, a linear induction motor for use in washing machines. Seeking 300 million dollars in damages, plaintiffs alleged that (1) defendant fraudulently appropriated Von Brimer's idea and invention after negotiations over the sale thereof had collapsed; (2) that defendant maliciously instituted a patent interference action with the Board of Patent Interference by amending its original patent application so as to include claims from the Von Brimer invention, thereby giving rise to the interference proceeding; and (3) that in so doing, defendant effectively clouded Von Brimer's title to the patent and thereby interfered with Von Brimer's contractual relations, specifically his attempts to license the patent both in the United States and abroad.

By agreement of the parties, the trial of this case was trifurcated, the parties first trying the question of palintiffs' standing to sue to the Court without a jury, and then, as necessary, determining liability and damages before a jury. The issue of plaintiffs' standing to sue was tried to the Court on November 3, 1972. On December 20, 1972, the Court issued its Memorandum of Decision and Order holding that plaintiffs did in fact have title in the aforementioned letters patent at such times as to find that they did have standing to sue under the three-count complaint.

Defendant then filed a motion for reconsideration on January 18, 1973, requesting that the Court reconsider its decision insofar as it held that Von Brimer maintained some interest in the patent from December 15, 1967, until January 29, 1969, when the interference action was terminated, insofar as that decision was based on Plaintiffs' Exhibit 6, which had been produced just prior to

* Joe W. Von Brimer died on March 26, 1971, and by order dated October 8, 1971, the representatives of his estate were substituted as parties plaintiff.

trial and upon which counsel had not therefore had the opportunity to respond to as fully as would have been the case had the document been produced in timely fashion and in compliance with earlier court orders. Briefs were filed on the motion, and on March 21, 1973, following oral argument, the Court held that in view of the repeated requests for all such documents, the very late offer of the document, its apparent significance, and the questionable foundation at trial for its authenticity and admissibility, it was going to exclude Plaintiffs' Exhibit 6, which had in fact been admitted subject to a motion to strike at trial. The Court went on to note certain issues as to chain of title to which, particularly in view of the Court's decision to exclude Plaintiffs' Exhibit 6, the parties had not addressed themselves. The Court then set April 26, 1973, for a further evidentiary hearing on the matters raised by the Court.

At the hearing of April 26, 1973, Philip Horrigan, an attorney for Mr. Bollinger during the period in which several of the documents in question in this case were drawn up, Mr. Bollinger himself, and Mr. Quirk all testified. Thereafter the parties submitted their proposed findings of fact and conclusions of law. Finally, on July 9 and 10, 1973, defendant's and plaintiffs' counsel, respectively, submitted their posttrial reply memoranda. The following opinion and order thus constitutes the Court's Findings of Fact and Conclusions of Law as to the standing of plaintiffs to maintain this action. This Court's Memorandum of Opinion and Order of December 20, 1972, insofar as it is inconsistent with or varies from these Findings of Fact and Conclusions of Law is withdrawn, vacated and set aside.

1. The actual language of conveyance transferred, assigned and conveyed to Von Brimer all patent concepts and developments made by Von Brimer to which V. B. Research & Development Corporation had or claimed any license rights or proprietary interests.

### I. The Admissibility of Plaintiffs' Exhibit 6

Plaintiffs' Exhibit 6 is a nine-page document which purports to show a transfer to Von Brimer of the 50% interest in the patent previously assigned by him to V. B. Research & Development Corporation.[1] The document, purportedly evidencing agreement among Von Brimer, Nevada Linear, and V. B. Research & Development Corporation bore two different dates[2] and, though a Xerox copy, was underlined apparently in pencil in several places.

Having heard the testimony of witnesses and the arguments of counsel, the Court affirms its tentative ruling of March 21, 1973, that Plaintiffs' Exhibit 6 must be excluded from evidence. The reasons for so holding are principally two: (1) the failure of plaintiffs to produce the document in a timely manner in response to repeated requests therefor by defendant's counsel and in response to the Court's order that all such documents be produced, and (2) the failure of plaintiffs to lay a proper foundation for the introduction of what was at best a poor duplicate copy of the exhibit.

### Willful Noncompliance with Discovery

On November 12, 1969, shortly after this case was filed, defendant made a motion for production of documents which was granted by order of the Court on December 1, 1969. That request and order included:

"34. All documents under which Von Brimer reacquired rights to the 'Von Brimer application and patent' from third persons not parties to this litigation."

"69. All documents exchanged between Von Brimer, his attorneys, his

2. On page 7 of the document there is a recitation that it was dated December 15, 1967, which appears to be the date of the document in light of the notarizations which follow on pages 8–9. However, page 1 of the document bears the inexplicable date of January 21, 1967.

agents, and the employees of any of them on one hand, and the following persons or any of their attorneys, agents, and employees on the other hand:

\* \* \* \* \* \*

V. B. Research and Development Corporation."

While documents were produced pursuant to this order, Plaintiffs' Exhibit 6, purportedly prepared on December 15, 1967, was not among them. On February 12, 1970, defendant served plaintiffs with some interrogatories directed toward ascertaining whether all documents required by the Court's order of December 1, 1969, had been produced. Plaintiffs' answers indicated that compliance had been effected. On May 5, 1971, plaintiffs' attorney filed a certificate of readiness under Local Rule 103 alleging completion of plaintiffs' response to defendant's request for production of documents.

This action was then dismissed on May 19, 1971, for lack of prosecution. In seeking reinstatement of the action, counsel for plaintiffs indicated that full compliance with the court's discovery order had been effected. The judgment of dismissal was vacated on July 26, 1971. The case was then reassigned to the undersigned on February 1, 1972. A status conference was held on May 2, 1972, and the matter set for trial on October 31, 1972. In the joint status report plaintiffs' counsel again represented to the court that discovery had been completed.

On October 12, 1972, less than three weeks before trial and some six months after the last of numerous representations to the Court that pretrial discovery orders had been complied with, plaintiffs came forth with nine additional documents, not previously produced. Plaintiffs' Exhibit 6 was not even among those late documents.

Finally, on October 30, 1972, one day prior to trial, defendant was furnished a copy of Plaintiffs' Exhibit 6. Defendant argues that in light of plaintiffs' failure to comply with the order of this Court, the exhibit must be excluded, at the least.

While the cases seem generally to indicate that the sanctions to be imposed for failure to comply with court discovery orders is a matter within the court's discretion, Diapulse Corporation of America v. Curtis Publishing Co., 374 F.2d 442 (2 Cir. 1967), Rule 37 of the Federal Rules of Civil Procedure attempts to give the court some guidance in the exercise of that discretion. Rule 37(b)(2) provides in relevant part:

"If a party or an officer, director, or managing agent of a party \* \* \* fails to obey an order to provide or permit discovery, \* \* \* the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

\* \* \* \* \* \*

"(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing matters in evidence[.]"

When appropriate, courts have even dismissed actions for failure to comply with their discovery orders. *Cf.* Norman v. Young, 422 F.2d 470 (10 Cir. 1970); Von Der Heyt v. Kennedy, 299 F.2d 459 (D.C.Cir. 1962). In light of the repeated requests for all such documents, and the Court's order, this Court finds that the failure of plaintiffs to come forward with this and other documents until literally the eve of trial to have been a willful failure to comply, and accordingly, will exclude Plaintiffs' Exhibit 6. However, the Court wishes to make certain that it is understood that this willful noncompliance was in no way attributable to present counsel for plaintiffs.

Even were this repeated failure to comply fully with the Court's order the only problem raised by the proposed Plaintiffs' Exhibit 6, it seems clear that the Court would be justified in excluding the document. In this case, however, there are additional reasons dictating such a result.

### No Proper Foundation

The Court also finds that plaintiffs have failed to lay a proper foundation for its admission into evidence, even had the document been timely produced. Because the document which plaintiffs seek to introduce is at best a photostatic copy of an original, it is clearly secondary evidence. Hopkins v. Hopkins, 157 Cal.App.2d 313, 320 P.2d 918 (1958). The best evidence rule mandates that in order to present secondary evidence of the contents of the original written instrument, evidence of its loss, destruction, or unavailability must be presented. Cal.Evidence Code, §§ 1500–1501; Simpson v. Dall, 3 Wallace (70 U.S.) 460, 18 L.Ed. 265 (1865). Here, despite testimony that the document was prepared in multiple or counterpart originals, no such original was brought forward. More important, there was no showing at trial that a diligent search had been conducted for the document. The document was admitted at trial subject to a motion to strike, since the case was being tried to the Court and not to a jury.

In Sellmayer Packing Co. v. Commissioner of Int. Rev., 146 F.2d 707 (4 Cir. 1944), the court summarized the best evidence rule as follows at 710:

"Under the rule, the party who offers secondary evidence of the contents of a document alleged to be lost must go further than to show that it is doubtful whether or not the document exists; he must demonstrate to the satisfaction of the court that although it once existed, it cannot be found despite a diligent and unsuccessful search and that there is no reasonable probability that it has been designedly withheld or suppressed."

In this case, there was no evidence at trial, despite defendant's objections to the document, of any search of the records of any of the parties to the alleged agreement, and to whom the duplicate originals were distributed.

Mindful of the need for restraint in the exclusion of any relevant evidence in cases tried to the court, the Court nonetheless feels that viewed in the circumstances of this case, proposed Plaintiffs' Exhibit 6 must be excluded.

As the court stated in Sylvania Electric Products, Inc. v. Flanagan, 352 F.2d 1005 (1 Cir. 1965) at 1008:

"There is no universal or fixed rule that determines the sufficiency of the proof required to show that a reasonable or diligent search has been made. Each case is governed in large measure by its own particular facts and circumstances. * * * [W]here the missing original writings in dispute are the very foundation of the claim, which is the situation in this case, more strictness in proof is required than where the writings are only involved collaterally."

The Court feels that the facts and circumstances of this case similarly dictate the exclusion of the proffered evidence. This is a case in which plaintiffs seek some $300,000,000 in damages for defendant's alleged misconduct. In this first trial, the document in question is very important in plaintiffs' attempts to establish a chain of title to the patent during the relevant time period. Where plaintiffs seek to base their claim in part on the document in question and (a) fail to produce that document until the day before trial, in violation of the Court's discovery order, (b) fail adequately to explain the absence of any of the multiple originals, or indeed even to show that a diligent effort to ascertain their location has been made, and thus (c) rely upon a poor copy of a document bearing on its face conflicting dates and pencil markings, the Court feels that the document must be excluded. Accordingly, the Court grants defendant's motion to strike and Plaintiffs' Exhibit 6 will not be admitted into evidence.

### II. The 50% Undivided Bollinger Interest

At the hearing held on April 26, 1973, three witnesses testified as to the circumstances surrounding the assignment

by Bollinger to John Quirk on November 27, 1967, of the 50% interest received by Bollinger from Von Brimer in October 1962.

In its Memorandum of Decision and Order of December 20, 1972, the Court held that Bollinger assigned his 50% undivided interest in the patent to John Quirk upon the condition that Quirk obtain a license agreement thereunder within one year with the rights assigned to revert to Bollinger if no license agreement were obtained. The assignment further provided for a one-year extension upon the payment of $10,000 to Bollinger. No license agreement was executed within the one-year period nor was any payment made for an extension of the assignment. Accordingly, the Court held that the 50% interest had, as provided in the agreement (Plaintiffs' Exhibit 5), reverted to Bollinger, and thus, that a purported conveyance from Quirk to Von Brimer dated February 13, 1969, was a nullity since Quirk had no interest which could be reacquired by Von Brimer.

At the hearing on April 26, 1973, however, plaintiffs sought to introduce several theretofore unproduced documents in an attempt to alter the terms of the agreement as evidenced by Plaintiffs' Exhibit 5. By these documents plaintiffs urge that the agreement signed on November 27, 1967, was in fact a two-part agreement, consisting of Exhibits 5 and 16, by which Bollinger conveyed his interest in the patent to Quirk. By this agreement, plaintiffs contend that Quirk agreed to pay to Bollinger a minimum of $10,000 by November 27, 1969, and that if this payment were not made, Bollinger was entitled to rescind his assignment to Quirk, contingent upon his giving notice of such intent. Accordingly, plaintiffs contend that the failure of Bollinger or his attorney, Mr. Horrigan, to exercise that power meant that no reversion occurred and that therefore, Quirk did have an interest in the patent which he assigned to Von Brimer on February 13, 1969.

Plaintiffs sought to introduce a memorandum prepared by Mr. Horrigan (Plaintiffs' Exhibit 15) suggesting certain changes in the Bollinger-Quirk agreement (Plaintiffs' Exhibit 5) and a draft attempt to incorporate all the proposed changes into one document (Plaintiffs' Exhibit 16).

 Without engaging in any of the attempts to interpret the subtleties of the conduct of the parties to the agreement which both parties suggest, and without expressly ruling on the admissibility of the proposed exhibits,[3] the Court reaffirms its earlier view that title to the 50% undivided interest in the patent reverted automatically to Bollinger upon failure of the conditions contained in the conveyance to Quirk, and hence that Von Brimer could not then acquire that interest from Quirk. The Court so holds for a number of reasons.

First, by its very terms the agreement provides in relevant part that:

"1. Pursuant to the terms and conditions hereinafter set forth, Bollinger hereby grants to Quirk all of his right, title and interest in U.S. patent No. 3194032 * * *."

"6. Quirk agrees to use his best efforts to secure a license agreement with a licensee which is substantial and competent to proceed. If, at the end of a one-year period from the date of this agreement, Quirk or his assigns have not executed such a license agreement, the rights granted herein to Quirk by Bollinger shall revert to Bollinger, provided, however, that the rights may be continued for another year upon payment to Bollinger, by Quirk or his assigns, of ten thousand ($10,000.00) dollars. In like manner, the default and remedy will apply at the end of each subsequent one-year period."

It being uncontested that no such license was secured, nor payment effected, the

---

3. It is clear that the same infirmity precluding the admission of Plaintiffs' Exhibit 6 (willful noncompliance with discovery) is present with respect to these exhibits.

reversion must be held to have occurred on November 27, 1968. The language of the document is clear and unambiguous and runs counter to plaintiffs' contention since it provides that the rights granted by Bollinger to Quirk "*shall* revert" (emphasis added) to Bollinger, unless either of the contingencies mentioned therein, the payment of $10,000 or the execution of a licensing agreement, *occurs within one year.*

■■ Second, even if the language were not so unambiguous and clear, it must be noted that the California Code of Civil Procedure § 1856 provides that:

> "When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be between the parties and their representatives, or successors in interest, no evidence of the terms of the agreement other than the contents of the writing * * *."

Under this rule, the Court would be precluded from even looking beyond the document if the intent of the party making the offer were to vary the terms thereof.

Plaintiffs urge, however, that under a line of California cases beginning with Luckie v. Diamond Coal Co., 41 Cal.App. 468, 183 P. 178, 182–183 (1919), the parol evidence rule does not apply in actions betweeen a party to a contract and a third party. As the court there noted at 41 Cal.App. 478, 183 P. 182:

> "Strangers to the contract are at liberty to show that the written instrument does not disclose the full or true character of the relation between the contracting parties. And if a stranger to the contract be thus at liberty, when contending with a party to the contract, the latter must be equally free to show the true relation between himself and the one with whom he has contracted. Both must be bound by this conventional rule of law, or neither."

There is, however, a substantial difference of opinion as to how far a party[4] to a writing is bound by the parol evidence rule in actions involving third parties or strangers. See 30 Am.Jur.2d, Evidence, § 1031 (1967); 13 A.L.R.3d 313 (1967). At least three of the most influential writers in the field have attacked the admission of parol evidence in such cases. Professor Wigmore (9 Wigmore, Evidence, § 2446 (3d Ed. 1940)) and Professor Williston (4 Williston, Contracts, § 647 (3d Ed.1961)) both argue that the cases are often arbitrary and confused and that the rule should be applied so as to exclude extrinsic utterances, even as against other parties, where it is sought to use those utterances for the very purpose for which the writing superseded them. Professor Corbin argues that if two parties have discharged antecedent negotiations between them by executing a complete written integration, they are discharged without regard to whoever may be asserting or denying the fact. 3 Corbin, Contracts, § 596 (1960). Further, he argues that in many of the cases holding to the contrary, the actual decisions can usually be explained on the ground that evidence tended to show that the integration was not complete and hence that oral evidence could have been admitted even between the parties to the writing. Corbin, "The Parol Evidence Rule," 53 Yale L.J. 603, 662–663 (1944).

Without seeking to enter fully into this debate, this Court is of the view that under the facts of this case, parol evidence should not be admitted to vary the terms of the agreement. This is so particularly because here it is not the "stranger," Whirlpool, which seeks to introduce the extrinsic evidence varying

---

4. While the parties to the contract in question, Quirk and Bollinger, are not parties to this action, Von Brimer cannot claim himself to be a stranger, since he seeks to establish that he in fact succeeded Quirk and hence was his assign. Jackson v. Donovan, 215 Cal.App.2d 685, 30 Cal.Rptr. 755 (1963); Jegen v. Berger, 77 Cal.App.2d 1, 174 P.2d 489 (1946).

the agreement but rather a party to that agreement. While there appears to be no case directly on point in California, several courts have held that while strangers to the instrument may offer parol evidence to impeach or contradict it, the parties to the instrument, even in controversies with strangers, cannot insist that the writing does not express what it was intended to express. See Allen v. Ruland, 79 Conn. 405, 65 A. 138 (1906); Adams v. Camden Safe Deposit & Trust Co., 15 N.J.Misc. 48, 188 A. 913 (1936), rev'd on other grounds, 121 N.J.L. 389, 2 A.2d 361 (1938). The reason for so holding is that to hold otherwise would result in much uncertainty between "strangers" and parties to a contract in dealings based upon that contract since the stranger could never rely on the document as it appeared on its face but rather would always be open to an alteration to his understanding of the contract by the introduction of extrinsic or even oral evidence, theretofore unknown and unknowable to him, by the other party to the contract. This Court will not adopt a rule resulting in such uncertainties in contractual transactions. Under the facts of this case, the Court need not decide whether the party to the contract is forever foreclosed from introducing extrinsic evidence, or whether he may do so once the "stranger" has sought to do so, since here Whirlpool has in fact sought to rely on the contract.

■ Finally, the Court notes that even were it to allow plaintiffs here to introduce extrinsic evidence to vary the terms of the contract, its conclusion as to the effect of Plaintiffs' Exhibit 5 would be no different.[5] This is so for several reasons. The memorandum of proposed changes, Exhibits 15 and 17, the attempted integration of documents and changes, Exhibit 16, and the conduct of the parties as regards the effect of their transactions reveal that as to the proposed changes evidenced by Ex-

hibits 15, 16 and 17, there was no meeting of the minds but rather only negotiations. Rather, insofar as the parties were able to agree and to embody that agreement in writing, that understanding is fully and unambiguously contained in Plaintiffs' Exhibit 5. That the parties did so view Exhibit 5 to incorporate their agreement is apparent from the fact that it was the only document the parties saw fit to fully execute and file with the U.S. Patent Office. It cannot realistically be suggested that where there are two documents, neither of which alone, it is claimed, reflects the full understanding of the parties, the parties would see fit to execute and file but one of them with the Patent Office.

Accordingly, the Court affirms its initial opinion that under the terms of the Bollinger-Quirk assignment of November 27, 1969, a reversion of that interest to Bollinger occurred on November 27, 1968, and that accordingly, Von Brimer took nothing by the purported assignment from Quirk of February 13, 1969. Consequently, Von Brimer cannot claim ownership of that interest in the patent during the relevant time period so as to establish his standing to bring this cause of action.

### III. *The Remaining 50% Interest in the Patent*

In setting the April 26, 1973, hearing, the Court also expressed its desire that the parties address themselves to the document of November 30, 1963, whereby Von Brimer transferred to V. B. Research & Development some interest in the patent (Defendant's Exhibit D). At trial on November 3, 1972, plaintiffs' counsel and defendant's counsel had argued that the instrument was, respectively, a license and an assignment, without any further discussion. In its opinion of December 21, 1972, the Court having admitted Plaintiffs' Exhibit 6 subject to a motion to strike, held that

---

5. In so holding, we need not comment on the legal significance of the fact that the documents by which plaintiffs seek to attack the agreement were not produced in response to

the Court's order, were not turned over prior to or at trial, and were first presented to the Court at the April 26th hearing.

since that document returned to Von Brimer whatever interest in the patent he had given V. B. Research & Development by the 1963 document, it was unnecessary to examine the earlier document. The Court in fact specifically reserved that question in saying:

"Whether this agreement constituted a license or an assignment of title to the patent need not be determined at this time, because on December 15, 1967, the parties entered into a second agreement whereby V. B. Research & Development transferred, assigned, and conveyed to von Brimer all patents and developments made by von Brimer to which V. B. Research & Development had or claimed any license, rights, or proprietary interests." (Memorandum of Decision and Order dated December 20, 1972, p. 6.)

In light of the Court's ruling today that Plaintiffs' Exhibit 6 will not be received in evidence, that exhibit being the document by which the return to Von Brimer was effected, it becomes necessary for the Court to determine precisely what the 1963 agreement between the same parties was, in order to finally set out the chain of title to the Von Brimer patent and thus to determine whether Von Brimer does in fact have standing to maintain this action.

The starting point for this inquiry is, of course, the document itself, which provides in relevant part:

"WHEREAS, V. B. RESEARCH & DEVELOPMENT, a Nevada corporation, is desirous of acquiring the right to license thereof,

* * * I, J. W. von BRIMER, by these presents do sell, assign, and transfer unto V. B. RESEARCH & DEVELOPMENT the sole and exclusive license and privilege to manufacture, use and sell and to grant sublicenses thereof together with the right to assign this license for the territory of the United States of America and for all foreign countries in and to said invention as described in the specification above identified file for obtaining Letters Patent of the United States therefor to be held and enjoyed by V. B. RESEARCH & DEVELOPMENT for its own use, behoof, and its successors, assigns and legal representatives to the full end of the term of which said Letters Patent may be granted as full and entirely as the same would be held by me had this assignment and sale not been made, and I covenant and warrant I have full right to do so."

In arguing that the document in question is in fact an exclusive license and not an assignment of title to the patent, plaintiffs rely on three arguments. First, they contend that the language of the document, and in particular the title thereof, the grant of an exclusive license, and the grant of the right to sublicense the patent, all dictate a finding that the agreement was the grant of an exclusive license. Second, plaintiffs urge that the Court must look to the circumstances surrounding the transfer and ascertain thereby the intention of the parties. In so doing, they contend, it will be seen that Von Brimer did not in fact intend to part with the patent title itself. This is seen by the fact that Von Brimer retained the express right to revoke the license at will, without notice, that he received no consideration for executing the license, that V. B. Research & Development never had the authority to actually manufacture, vend or use the invention, that Von Brimer had final authority to accept or reject all sublicenses obtained by V. B. Research & Development, and that V. B. Research & Development did not have the right to assign the license. Third, plaintiffs imply that, in effect, the Court should pierce the corporate veil and find that Von Brimer was V. B. Research & Development in that he controlled and dominated the business enterprise and that it served as "an alter ego for his personal purposes." Thus, although Von Brimer may in fact have assigned the patent to V. B. Research & Development, the Court should disregard the corporate entity and find Von Brimer to be the owner of that patent interest.

Turning its attention first to the agreement itself, the Court is of the opinion that no one element thereof can be said to determine the nature·of the document. It hardly bears mentioning that the name given by the parties to a document has little if any impact on the legal effect of its provisions, and hence will be given little weight in construing it. Waterman v. Mackenzie, 138 U.S. 252, 256, 11 S.Ct. 334, 34 L.Ed. 923 (1891); Watson v. United States, 222 F.2d 689 ·(10 Cir. 1955). Similarly, the fact that the agreement includes the right to sublicense the patent cannot be said to determine that the interest transferred by the agreement is necessarily a license. Kavanagh v. Evans, 188 F.2d 234 (6 Cir. 1951); American Type Founders v. Dexter Folder Co., 53 F.Supp. 602 (S.D.N.Y. 1943); United States v. Carruthers, 219 F.2d 21 (9 Cir. 1955).

The issue here becomes then, what standard is to be applied in assessing all the various aspects of the document to determine whether it in fact is a license or an assignment. The cases dealing with this question seem to fall into two groups. The first group of cases stem from the Supreme Court's decision in Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891), in which the Court attempted to set down guidelines for distinguishing licenses from assignments for purposes of determining what parties were necessary to maintain patent infringement suits. There the Court stated:

"Every patent issued under the laws of the United States for an invention or discovery contains 'a grant to the patentee, his heirs and assigns, for the term of seventeen years, of the exclusive right to make, use, and vend the invention or discovery throughout the United States and the territories thereof.' Rev.Stat. § 4884. The monopoly thus granted is one entire thing, and cannot be divided into parts, except as authorized by those laws. The patentee or his assigns may, by instrument in writing, assign, grant, and convey, either (1) the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or (2) an undivided part or share of that exclusive right; or (3) the exclusive right under the patent within and throughout a specified part of the United States. Rev.Stat. § 4898. A transfer of either of these three kinds of interest is an assignment, properly speaking, and vests in the assignee a title in to much of the patent itself, with a right to sue infringers; in the second case, jointly with the assignor; in the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement." 138 U.S. at 255, 11 S.Ct. at 335.

The other line of cases, which seem to have no one parent and do not contain any such concise standard, generally arise out of the attempt by courts to decide whether the transfer of interest in the patent in question qualifies for capital gains treatment or not, a question which turns on a determination of whether or not the taxpayer has transferred "all substantial rights" to the patent in question. See United States v. Carruthers, *supra*; First National T & S Bank of San Diego v. United States, 200 F.Supp. 274 (S.D.Cal.1961); Schmitt v. Commissioner of Internal Revenue, 271 F.2d 301 (9 Cir. 1959).

In the present case, when examining the document alone, however, the Court is of the view that the particular standard to be applied is of little significance since, by its all-embracing language, the document clearly transfers to V. B. Research & Development an interest which is close to, if not identical with, the patent itself. Using the language of the *Waterman* line of cases, the court stated in All Steel Engines v. Taylor Engines, 88 F.Supp. 745 (N.D. Cal.1950), aff'd, 192 F.2d 171 (9 Cir. 1951).

"It is settled patent law that the grant of an exclusive license to make, sell and use a patented invention throughout the United States constitutes an assignment of the entire patent rights or monopoly." (88 F.Supp. 747)

See also Switzer v. Commissioner of Internal Revenue, 226 F.2d 329 (6 Cir. 1955) to the same effect. Unlike many of the tax cases and patent infringement cases relied on by plaintiffs, the grant of powers in the document in question contains none of the reservations of rights found in those cases and upon which the courts often based their findings of license, or lack of control. In Switzer Brothers, Inc. v. Byrne, 242 F. 2d 909 (6 Cir. 1957), on which plaintiffs rely, the court found the agreement to be a license where on its face the document noted the existence of prior licenses and expressly required the transferee to honor the provisions of those outstanding licenses, and provided further that the interest transferred could not be assigned and was to terminate with the bankruptcy or liquidation of the licensee. In Six Wheel Corporation v. Sterling Motor Truck Co., 50 F.2d 568 (9 Cir. 1931), the court held the agreement not to be an assignment where the grantor expressly stated in the agreement that the grantee could only license others, and not make, use and vend the subject invention itself. In addition, there were elaborate provisions for placing the transferee in default and reversion to the inventor.

Here, however, there is an unrestricted grant of authority exclusively to "manufacture, use and sell and to grant sublicenses thereof, together with the right to assign this license for the territory of the United States of America and for all foreign countries in and to said invention * * * to be held and enjoyed by V. B. RESEARCH & DEVELOPMENT for its own use, behoof, and its successors, assigns and legal representatives to the full end of the term of which said Letters Patent may be granted as full and entirely as the same

would be held by me had this assignment and sale not been made * * *."

Indeed, it is hard to imagine any broader grant of rights than that enumerated in this agreement. As defendant properly points out, the grant contained in the document is virtually identical to that contained in the patent itself, and for the full life thereof, pursuant to 35 U.S.C. § 154.

Accordingly viewing the document alone, the Court is of the opinion that the instrument evidences "a clear and unmistakable intent to part with the patent," Switzer v. Commissioner of Internal Revenue, 226 F.2d 329, 330 (6 Cir. 1955), and that accordingly, it must be viewed as an assignment to V. B. Research & Development of Von Brimer's interest in the patent.

█ Plaintiffs then urge, relying on Switzer v. Commissioner of Internal Revenue, supra, that the Court should consider "the total factual complex surrounding the transaction," the terms and conditions placed on the transaction by Von Brimer, and the subsequent conduct of the parties. Plaintiffs rely heavily on the testimony given on April 26, 1973, by Mr. Selby and Mr. Smith, both directors, officers, and shareholders of V. B. Research & Development at the time of the transaction. Briefly, it was their testimony that (a) the company was denied the authority to actually manufacture, use, or sell the invention, (b) Von Brimer retained the right to have final approval of all sublicenses, (c) Von Brimer retained the right to revoke the license at will, without notice, and (d) Von Brimer retained the right to license the patent for others. It was further claimed that Von Brimer received no consideration for executing the document. Accordingly, when the "total factual complex" surrounding the transaction of November 30, 1967, is thus viewed, it will be seen that the grantor retained substantial rights and control over the patent, and that accordingly the grant of an exclusive license in this case cannot be viewed as an assignment.

Switzer Brothers, Inc. v. Byrne, 242 F. 2d 909 (6 Cir. 1957); Agrashell Inc. v. Hammons Products Company, 352 F.2d 443 (8 Cir. 1965).

As noted earlier, however, the document on its face does not evidence any of the reservations on the transfer which plaintiffs contend Von Brimer imposed thereupon. In fact, virtually every restriction which it is claimed Von Brimer imposed is specifically granted by the document, and there is a recital of consideration having been given. The Court is thus hard pressed to understand how the fact that V. B. Research & Development chose not to exercise its full rights under the agreement, whether through court action, if necessary, or otherwise, can be said to justify an extremely restricted view of the rights granted. The only basis upon which such an argument could be advanced would be that V. B. Research & Development was, in fact, unable to so exercise or enforce its rights because of Von Brimer's control and domination of the corporate entity, which is the final argument advanced by plaintiffs.

Essentially, plaintiffs contend that Von Brimer controlled the corporation in all its business activities and used it for his personal purposes. Accordingly, it is urged that even if the Court finds that the patent interest transferred was an assignment, the Court should disregard the corporate entity and find that it was in fact Von Brimer, through his "alter ego," V. B. Research & Development, who held the patent rights and that accordingly, Von Brimer has standing to bring this action based on that ownership.

 The Court has several difficulties with the argument put forward by plaintiffs. First, courts have generally disregarded the corporate entity only where there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist. Maxwell Cafe v. Department of Alcoholic Beverage Control, 142 Cal.App.2d 73, 298 P.2d 64 (1956). The factors looked to by the courts include whether or not stock was issued, other legal formalities followed, or a mixing of corporate and personal finances occurred. While no evidence was presented showing the precise percentage or number of shares of the corporation owned by Von Brimer, it was shown that there were at least three other shareholders having among them in excess of 40,000 shares of stock. Therefore, at least at this cursory level, which is all the Court is capable of in view of the lack of evidence on this matter, there appears to have been no such identity of ownership as courts have generally required. Marr v. Postal Union Life Ins. Co., 40 Cal.App.2d 673, 105 P.2d 649 (1940).

 Second, in order to disregard the corporate entity, courts have generally held that it is not enough that the company is controlled by, or a mere instrumentality or conduit of, its shareholders, but it must also appear that to recognize their separate entities would lead to an injustice. Judelson v. American Metal Bearing Co., 89 Cal.App.2d 256, 200 P.2d 836 (1948). Accordingly, the entity is usually disregarded only in cases where it has been used to evade statutory or contractual obligations, In re Penn Central Securities Litigation, 335 F.Supp. 1026, 1035 (E.D.Pa.1971), or where it has been used to mislead outsiders, such as creditors, by undercapitalization, for example. It is generally held that only third parties and never the corporation or its shareholders can seek to disregard the corporate entity. Here aside from the fact that it is the very person, and his successors, who allegedly used the corporate entity to his own personal ends who is seeking now to have that entity disregarded, the Court can see no injustice or fraud which has been perpetrated, which will be allowed to occur in the event the entity is not disregarded. In this respect, the language of the court in Aladdin Oil Corporation v. Perluss, 230 Cal.App.2d 603, 614, 41 Cal.Rptr. 239, 246 (1964) bears recitation:

"Parties who determine to avail themselves of the right to do business by means of the establishment of a

corporate entity must assume the burdens thereof as well as the privileges. The *alter ego* doctrine is applied to avoid inequitable results not to eliminate the consequences of corporate operations."

■ Accordingly, the Court does not find that this is a proper case in which to invoke that doctrine and will not do so. Therefore, it is the opinion of this Court that by the transaction of November 30, 1963, Von Brimer assigned his remaining rights under the patent to V. B. Research & Development and therefore held no interest in that patent during the relevant time period necessary to sustain a finding that Von Brimer has standing to bring an action based upon alleged malicious prosecution and interference with contractual relations.[6] While Von Brimer lacked standing to bring the claims in the Second and Third Causes of Action to the complaint, there remains the question of standing under the First Cause of Action, the fraudulent appropriation claim. As the Court pointed out in its prior order of December 20, 1972, standing with respect to that claim is based upon ownership of the invention on which the patent claim was based during the period between August 29, 1962, and December 15, 1965, the time period during which, it is claimed, the wrongful appropriation occurred. Von Brimer had a 100% interest in the invention from August 29, 1962, to October 24, 1962, and until November 30, 1963, an undivided one-half interest in the invention. Even though he may have had standing based upon this ownership, the fact that suit was not commenced until May 13, 1969, raises the question of the possible bar of the statute of limitations. While this matter has not been the subject of any motion or the proposed findings of fact or conclusions of law submitted by the parties, the Court feels it should be briefed and argued by the parties.

Based upon the foregoing findings of fact and conclusions of law, it is this Court's conclusion that from November 30, 1963 on, and particularly between December 15, 1965, when it is claimed defendant Whirlpool copied the claims from the Von Brimer patent, bringing about the interference action and disrupting the contractual relations, and May 13, 1969, when this action was commenced, following the termination of the interference proceeding on January 29, 1969, Von Brimer held no interest in the patent here upon which he would have standing to sue for those claims.

Accordingly, it is hereby ordered, adjudged and decreed that the Second and Third Causes of Action of the complaint are dismissed.

It is further ordered, adjudged and decreed that insofar as this Court's Memorandum of Opinion and Order of December 20, 1972, is inconsistent with these findings of fact and conclusions of law, that Memorandum of Opinion and Order is vacated and set aside.

It is further ordered, adjudged and decreed that the parties are directed to appear at a pretrial conference at 10:30 A.M. on Tuesday, August 28, 1973, to establish a briefing schedule on the issue of the possible bar of the statute of limitations, to discuss the remaining issues to be tried, and to set a trial date.

---

6. Plaintiffs contend that even if Von Brimer had no interest in the patent during the relevant time period, he, nevertheless, had standing with respect to the Second and Third Causes of Action because they are based upon personal, not property, rights. No authorities were cited in support of this novel proposition except for an elliptical reference to Prosser who suggests that there may be too much emphasis placed on the property element in cases involving interference with commercial or economic relations. Even assuming that may well be correct in some cases, it certainly does not apply here. A careful reading of both the Second and Third Causes of Action makes it abundantly clear that in each the gravamen of the matters complained of is the alleged tortious conduct of defendant with respect to Von Brimer's interest in the patent, not with respect to any personal rights he may have had apart from the patent and the invention it disclosed.